Filed 12/19/13  P. v. Pinuelas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>RUBEN PINUELAS et al.,<br><br>      Defendants and Appellants. | F062475<br><br>(Super. Ct. No. 08CM7011) |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>LOUIS JIMENEZ,<br><br>      Defendant and Appellant. | F062608<br><br>(Super. Ct. No. 08CM7011)<br><br>**OPINION** |

APPEALS from judgments of the Superior Court of Kings County.  James T. LaPorte, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Ruben Pinuelas.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Aldrin Trejo.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Louis Jimenez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

On April 3, 2007, three prisoners were involved in a fight (the altercation) at the Substance Abuse Treatment Facility (SATF) in Corcoran, California, the prison at which the events occurred. The three prisoners who were fighting were defendants Louis Jimenez and Aldrin Trejo and the alleged victim, Marcos Villalobos. All three were members of the Sureno criminal street gang. The prosecution posited that Jimenez and Trejo were ordered to attack Villalobos by the third defendant, Ruben Pinuelas.

The jury found the three defendants guilty of conspiracy to commit murder (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a)),[1] attempted murder (§§ 664, 187, subd. (a)), and assault with a deadly weapon by a prisoner (§ 4501). The jury also found true the allegations that Trejo and Jimenez inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), and, as to all defendants, the crime was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).

Defendants raise numerous arguments, including challenges to the sufficiency of the evidence and the expert testimony. We address only the sufficiency of the evidence argument, finding resolution of that argument dispositive. As we shall explain, the evidence to support the prosecution's theory was almost nonexistent. While the

---

[1]All statutory references are to the Penal Code unless otherwise stated.

2.

prosecution presented extensive, and perhaps excessive, evidence in an attempt to establish motive, there was no evidence that (1) Trejo and Jimenez initiated the altercation with Villalobos, (2) a weapon was used by any party during the altercation, and (3) an order to attack Villalobos ever was communicated to Trejo and Jimenez.

The prosecution relied on "expert opinion" evidence to convince the jury there was evidence for each of these elements. As we shall explain, however, the opinions on which the prosecution relied were based entirely on speculation and conjecture, not substantial evidence. Accordingly we will reverse the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

**The Information**

The information charged defendants with conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)), attempted murder (§§ 664, 187, subd. (a)), and assault with a deadly weapon on an inmate (§ 4501). Numerous enhancements were alleged, including (1) Jimenez and Trejo personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), (2) the crimes were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C), and (3) each of the defendants suffered a prior conviction within the meaning of section 667, subdivisions (b) through (i).

**Percipient Witness Testimony**

Stewart Mackey is a correctional officer at SATF. On April 3, 2007, the day of the altercation, Mackey was working in observation tower No. 2 in the "C" facility. Tower No. 2 observes yard No. 2. Yard No. 2 is attached to housing units five, six, seven, and eight.

3.

At approximately noon, Mackey heard other correctional officers ordering the inmates to lie on the ground. He then saw two inmates fighting with another inmate.[2] Jimenez and Trejo were swinging closed fists at the head and upper torso of Villalobos and rapidly advancing as Villalobos retreated. Villalobos defended himself by swinging closed fists at the two attacking inmates. The three inmates moved within an area of approximately 10 to 20 feet during the time Mackey observed them. The portion of the altercation Mackay saw lasted approximately 20 seconds.

Mackey used the public address system to order all the inmates to lie on the ground. Most inmates lay on the ground, but the three inmates continued to fight. Mackey observed blood on all three participants, but most of the blood was on Villalobos. Another officer fired a nonlethal 40-millimeter launcher, causing the three inmates to lie on the ground.[3] They did not move until officers approached.

Mackey did not see how the altercation began. He did not see a weapon, nor did he see any type of stabbing motion. He did not see the three inmates throw anything. The three inmates were restrained and then escorted from the yard. The three inmates were not near the toilet that is located in the yard. The portion of the yard where the altercation occurred usually is occupied by Southern Hispanics.[4]

Mackey had been a correctional officer for approximately 17 years at the time of trial. He estimated he had seen between 50 and 100 physical confrontations between inmates in the yard. Such confrontations were common and often occurred once a week.

---

[2]Mackey was unable to identify the inmates involved in the altercation, but for the ease of the reader we will use the names of the parties when appropriate.

[3]A 40-millimeter launcher fires a nonlethal foam projectile for an effective distance of about 35 yards.

[4]"Southern Hispanics" apparently is the term used by California's Department of Corrections and Rehabilitation (CDCR) to refer to members of the Sureno criminal street gang.

Confrontations occur for a variety of reasons, including disagreements on a television channel, drug debts, disrespect of opposing gang factions, and racial tension. Mackey concluded the attack was the result of inmate politics and someone was being "disciplined or hit" because the location where the altercation occurred is in a part of the yard typically occupied by Southern Hispanics, two inmates were fighting one inmate, and the amount of blood on Villalobos.

Antonio Becerril also is a correctional officer at SATF. On the date of the altercation he was assigned to an observation tower for yard No. 1. At about noon he heard verbal commands in yard No. 2 ordering inmates to lie on the ground. Becerril ordered the inmates in yard No. 1 to lie on the ground and then turned to yard No. 2 and observed a fistfight between three inmates. The inmates ignored Becerril's order to stop fighting. Becerril then fired his nonlethal 40-millimeter launcher at the inmates. The three inmates then lay on the ground. All of the other inmates in yard No. 2 were lying on the ground when Becerril first observed the inmates fighting.

Becerril did not see any weapons, did not see anyone throw anything, and did not see the three inmates who were fighting go near the toilet area in yard No. 2.

Dan Goss is a lieutenant with CDCR stationed at SATF. He responded to yard No. 2 on the date of the altercation. Upon arrival he observed Trejo and Jimenez striking Villalobos. All three appeared to be covered in blood. Goss assembled the responding staff and moved towards the scene of the incident and placed the inmates in restraints.

Goss called the investigative services unit (ISU) to process the crime scene. He did not obtain any useful information when he interviewed Villalobos. Prison staff searched the area where the altercation occurred but did not find any weapon. A clothed body search of the inmates did not locate any contraband. The inmates not involved in the altercation were checked with a metal detector before they were permitted to return to their housing units. No contraband was found.

Goss estimated the three inmates involved in the altercation were about 30 feet from the yard's bathroom facilities. Goss was not aware of anyone doing anything suspicious in this area once his men entered the yard. All of the inmates were under officer observation while they were in the prone position. Goss was not aware of any inmate making a furtive movement during this time.

Benito Martinez is a correctional officer who was assigned to the ISU at SATF in 2007. He and other ISU officers searched the yard near the altercation and did not find any weapons.

Miguel Vargas, who was assigned to the ISU at SATF in 2007, responded to the altercation. His assignment was to collect and photograph evidence. One of the photographs taken by Vargas was of a wound found on Jimenez's hand. The wound appeared to Vargas to be a puncture wound, although he had no idea how Jimenez had been injured. Vargas opined that when a puncture wound exists, it indicates someone is attempting to harm another individual. A puncture wound could be caused by getting stabbed or attempting to stab someone but instead stabbing yourself.

Janet Anders is a correctional officer who was assigned to the ISU on the date of the altercation. She escorted Villalobos to the van that transported him to the treatment facility. Photographs Anders took of Villalobos's injuries were admitted into evidence.

Kayleen Powell is a registered nurse employed at SATF. She treated Villalobos on the day of the altercation. She noted several wounds, some of which she treated by cleaning and applying a bandage and some of which required treatment by a medical doctor. Her activities, which would be considered first aid, lasted for approximately 10 minutes. She also noted that Villalobos suffered scalp wounds, which tend to bleed more profusely than other parts of the body.

**Photographs on Trejo's Cell Wall**

On July 21, 2010, over three years after the altercation, Michael Harris, a correctional officer at SATF, conducted a search of Trejo's cell. On the wall of the cell

was a photograph of Trejo in which Trejo appeared to be covered in blood. The photograph was contained in a "hobby craft" frame.[5] Harris also saw on the wall a copy of exhibit No. 21, which apparently was a photograph of Villalobos when he was receiving treatment after the altercation.

**Expert Testimony -- Ryan Couch**

Ryan Couch is a correctional officer who was assigned to the ISU on the day of the altercation. He provided both percipient witness testimony and expert testimony. We summarize his entire testimony in this section.

### 1. Testimony Related to the Altercation

On the date of the altercation, Trejo, Jimenez, and Villalobos were housed in facility C, building No. 5. Couch confirmed that while Trejo, Jimenez, and Villalobos were housed in the same building, Pinuelas was in a different building in the lower (different) yard. Villalobos was transferred to the administrative segregation unit (ASU) after the altercation.

Couch was responsible for supervising the staff that processed and evaluated the scene of the altercation. The upper and lower yards were searched, but no weapon was found.

### 2. Testimony Related to the Authorization Kite

On April 16, 2007, 13 days after the altercation, Couch responded to cell No. 202 in building No. 4, facility C, which was inmate Valencia's cell. Couch collected 102 "kites," or notes passed between inmates from cell No. 202, which was an unusually

---

[5]Harris did not explain to the jury how a "hobby craft" frame was constructed. In an Evidence Code section 402 hearing, Harris explained that a hobby craft frame is a picture frame constructed of paper rolled into the shape of straws and then stacked around a photograph.

large number to be found at one time.[6]  The kites were collected and taken back to the ISU office.

Upon examination of the documents, Couch determined one of the kites "ordered the hit [or] elimination of inmate Villalobos that had happened three weeks prior to finding these kites."  The kite contained spaces for the names of individuals who were authorized to conduct the attack, but these spaces were blank.  When questioned about when this kite was written, Couch opined that it must have been written before the altercation because after that date Villalobos did not return to facility C at SATF.

There are no facts in the record to support Couch's proclamations that the "authorization" in the kite resulted in the altercation or was written before the altercation.  Nor is there any evidence that Pinuelas knew that Villalobos would not return to facility C.

Couch recognized the handwriting on this kite as belonging to Pinuelas.  Couch admitted he did not know if the kite ever went to the yard for cell Nos. 5 through 8 or if Pinuelas ever gave the kite to anyone other than Valencia.  A different kite found in Valencia's cell, also authored by Pinuelas, authorized the attack on a different inmate.

Couch testified that Pinuelas owned the kites because he wrote them, and they were in Valencia's cell because Pinuelas gave them to Valencia to hold while Pinuelas went out to the yard on the day of the search.  In other words, Couch's opinion was that Pinuelas was in possession of the kites until shortly before they were discovered in Valencia's cell.  No one observed this transfer of kites, so there was no evidence to support this theory.

Couch read into evidence parts of the kite that he felt authorized the attack on Villalobos.[7]  The kite began by authorizing the "hit/elimination" of Villalobos.  Couch

---

[6]Defendants introduced testimony that in 2009 only 89 kites were found in the prison's evidence locker, apparently in an attempt to discredit testimony about the kites.

opined this meant that Villalobos was to be killed. If the intent behind the kite was to injure, but not kill, an inmate, the kite would have used the phrase "check" or "hard candy."

Couch opined that the phrase "open hostility, treason and conspiracy" used in the kite was the most serious accusation that could be made against an inmate in the Sureno prison gang. Couch also opined that the terms used in the kite suggested Villalobos attempted to establish a competing inmate power structure to control the inmate population at SATF or disrespected those in power.[8] Couch opined that an inmate would

---

[7]The portion of the kite read into the record stated, "To whom this may formally concern, let this be written declaration authorizing the hit/elimination of the following target, Mino De Puente Terama Street/Villabos [*sic*], K67309 who is to be immediately dealt with accordingly and removed from this very honorable yard, CSATF C yard as soon as possible for the condemned acts of open hostility, treason and conspiracy ominously committed by the aforementioned target. Contrary to all that which we sure are represent and uphold with pride, honor and discipline." "The dishonorable actions of the target[']s past/current behavior, demeanor here has been very unacceptable, intolerable and consists of the following severity of major offenses or Ers. The target tried to unwisely politic against us at the Mesa here. He dared to disrespectfully try and question/undermined the standing over all authority of the established Mesa and our righteous long standing legitimacy here as well. [¶] He disgracefully tried to creat chaos and distention here amongst our Sur ranks by ill willfully trying to disrupt the harmony and unity we Sur have soundly solidified and kept well maintained here." "He maliciously tried to interfere with, deflect and obstruct the making collection process of our dearly beloved Tio circle A funds and finances. The target tried to wrongly misuse, abuse in false pretext the names of some highly authorized righteous commencing camaradas without him having the proper authorizations or grounds to even utter such nobly recognized designations. He has disastrously tried to spread false bogus propaganda and futile attempts to assassinate the character of some very good camaradas, loved ones just as he was also part of a disruptive condemned fashion that tried to … blasmously question the integrity and honor of some very good highly revered and truly vulnerable individuals relations that are absolutely forbidden to question … and are far to personal to put on paper at this time."

[8]The "Mesa" is the phrase apparently used by inmates to describe the Sureno power structure in prisons. Couch said that in level four prisons, the yard is run by a "shot caller" who tells the Mesa how to run the prison yard. The primary issues apparently are control of the drug traffic and "respect," including retribution for

---

never falsely claim to be part of the inmate power structure. Finally, Couch opined that the person who signed the kite, Pinuelas, was the head of the inmate power structure in facility C. Couch insisted there were four to eight other members of the inmate power structure in facility C, but admitted he did not know who those inmates were.

Couch testified the portion of the kite that stated, "But nevertheless in the meantime" "necessitate results in the target[']s dishonorable punishment," "From this … founded principal land whether or not the target stays strong afterwards" "is entirely up to him" did not mean the order was only to punish, and not kill, Villalobos. But because weapons in prison are crudely made, this portion of the kite merely recognized the possibility that Villalobos would survive the attack.

Couch admitted Jimenez was not named in the kite authorizing the altercation, or in any of the kites recovered from Valencia's cell.

In an attempt to explain how the kite *may have been* transferred between buildings, Couch testified that inmate representatives frequently (95 percent of the time) carried kites between the different sections of the prison. There was no evidence this kite ever was passed between different sections of the prison.

### 3. Testimony Related to Gang Affiliation

On September 21, 2007, five months after the altercation, Couch searched Trejo's cell. Couch found a cup that had been modified with gang slogans, a piece of paper on which the house "reglas,"[9] or rules, were written, and other items which tied Trejo to Sureno street gangs. Couch testified possession of the house reglas is an indication the inmate is affiliating with the Sureno gang while in prison. Furthermore, Couch testified the house reglas were written by Pinuelas. One of the rules prohibited any fighting

informing or failing to follow the orders of the Mesa. The Mesa will then make sure other Surenos enforce the orders of the shot caller or the Mesa.

[9]In the reporter's transcript, the Spanish word for "rules" is spelled regles. The correct spelling of this word, however, is reglas.

10.

among inmates affiliated with Surenos. There is no evidence as to when Trejo obtained the house reglas.

### 4. *Testimony Related to the Intent of the Altercation*

Couch opined that if an inmate was assaulted in the yard, the assault was committed with the intent to kill. Couch reasoned that since there are a limited number of level four prisons in California, a Sureno gang member would not want to create an enemy by getting into a fight because "[i]f you create an enemy within the system, you now run the risk of that enemy coming back and trying to kill you at a later time, so they are not in the business of creating enemies, they are in the business of again finishing what they need to do[,] which is commit the murder."

Couch observed that because the altercation occurred in the yard, as opposed to in a cell, many inmate privileges were lost. Couch specifically mentioned (1) the yard was put on lockdown, (2) canteen privileges were lost, (3) packages sent from the outside were not delivered, (4) visiting privileges were lost, (5) the privilege of making telephone calls was lost, (6) access to the law library was stopped, (7) laundry exchanges were stopped, and (8) the ability to move kites around the prison was hampered. As a result of the lost privileges, communication between Sureno gang members would be restricted, and the ability to sell drugs in the prison would be hampered. Couch opined that "the crime of open hostility, treason and conspiracy is worth the adverse conditions of a lock down."

### 5. *Testimony Regarding the Alleged Motive*

Couch presented recordings of phone calls made from the prison. In two different calls, Couch testified that Pinuelas's mother indirectly inquired about the identity of the other inmates on the power structure with Pinuelas, using code words and phrases. In a third call, Couch interpreted comments as an inquiry about whether a drug debt had been paid. In a fourth call Couch interpreted a question from Pinuelas's mother as being an inquiry about whether there were two separate power structures in the prison and

11.

Pinuelas's response as indicating there were not. Couch opined that Pinuelas was shocked by the suggestion someone was attempting to take power from him, although it is impossible to tell how he reached this conclusion or why expert testimony was necessary to reach this conclusion. The information, according to Couch, was obtained to relay to the head of the Mexican Mafia.

Finally, Couch interpreted a comment made by Pinuelas's mother as a request to tell Trejo that his sister loved him, but Pinuelas responded that he did not see Trejo at that time because Trejo was in a different building. Pinuelas's mother used the moniker "Porky," not Trejo's name. Couch interpreted this to mean that Pinuelas knew Trejo at the time the phone call was made, which was several months before the altercation.

### 6. Demeanor

Throughout his testimony, Couch proclaimed that he "knew" certain "facts" to be true. For example, when questioned about the kite authorizing the altercation, Couch stated the kite was delivered to the upper yard and the altercation occurred because of the kite. Yet when confronted about the lack of any evidence to support these statements, Couch asserted that was his opinion. When confronted about the lack of facts to support this opinion, Couch asserted his statement was "not a guess that is what would have happened." Such statements obviously were nothing more than Couch's theory of events, even though there were no facts to support the theory.

**Testimony Related to Pinuelas's 2010 Arrest and the Documents Seized**

Pinuelas was released from prison after the altercation. Several peace officers presented testimony that when Pinuelas was arrested in 2010, he had in his possession two notebooks that contained evidence of drug transactions. A questioned documents examiner testified that he compared the notebooks, as well as the house reglas and two of the kites recovered on April 16, 2007, and determined they were all written by the same individual. The prosecution claimed this testimony was relevant because it helped establish Pinuelas was a member of the Sureno criminal street gang.

12.

**Expert Testimony -- Andrew Meyer**

The People called Andrew Meyer as an expert witness in "street gang activity."

*1. Testimony Related to the Authorization Kite*

Meyer testified briefly about the authorization kite. He explained that at the bottom of the kite were symbols that he interpreted as being words spelled in the Mayan language. He then "asked other gang experts who are familiar with the Aztec and Mayan languages" and he "received actual documentation interpretations of words from Mayan to the English language as it pertains to the Surenos." Even with this assistance, Meyer was unable to interpret the symbols. An objection was sustained at this point although the testimony was not stricken.

*2. Testimony Related to Gang Affiliation*

Meyer testified that the Surenos "are one of the largest gangs in America" with over 500 Sureno gangs in California alone. Meyer identified the "Latin Boys" as a Sureno gang in California based on his conversation with "a detective in the area where the Latin Boys either originated from [or] live, and he confirmed with [Meyer] that they are in fact a Sureno gang from that area." The primary activities of the Sureno criminal street gang include murder, assault, drug sales, prostitution, and witness intimidation.

Notwithstanding Meyer's being qualified as an expert in street gang activity, he opined that "[n]o matter what kind of rivalry they may have on the streets," all Sureno gang members in prison "are expected to align with one another and get along for the common good of the gang." It is unclear on what foundation this opinion was based. Meyer opined that all inmates who align with the Surenos are part of the Sureno criminal street gang. He also opined that all Surenos are under control of the Mexican Mafia, and all Surenos are obligated to obey every command given to them by the Mexican Mafia.

Meyer testified the Mexican Mafia wants to control the prison drug sales, so therefore it attempts to control the prison. According to Meyer, the sales price of drugs inside the prison is 10 times the street price of the drugs. Meyer opined the Mexican

13.

Mafia is paid one-third of all drug revenue generated from inside the prison. The foundation for these "opinions" was a conversation Meyer had with an unidentified correctional officer.

Next, Meyer testified to his opinion about the gang affiliation of defendants.

### A. *Jimenez*

Meyer testified he reviewed a Sacramento police report dated September 30, 2003, which indicated Jimenez had been in a fight, and after the fight Jimenez admitted he was a Sureno gang member. The report also indicated the fight was between Surenos and Nortenos.

Next, Meyer reviewed a Sacramento police report dated December 18, 2005, that involved a stabbing. The victim "had been stabbed, collapsed the lung and was also stabbed in the kidney. Mr. Jimenez was arrested for that stabbing. He later admitted that it was a rival gang issue, the victim was a Norteno and the reason Mr. Jimenez stabbed him was because the rival called him a scrap."

Meyer reviewed an incident log from Duel Vocational Institute dated September 22, 2006, wherein 12 "Southern Hispanic Surenos" attacked an inmate. Jimenez was one of the group who attacked the single inmate.

Meyer noted that Jimenez admitted he was a Sureno when he was initially housed at SATF. Meyer also noted Jimenez had been convicted of violating section 186.22, subdivision (b)(1), a gang enhancement.

Finally, Meyer testified the altercation also supported his opinion that Jimenez was a Sureno. "Mr. Jimenez was part of the stabbing on Mr. Villalobos. There is -- he was with another Sureno gang member[.] [¶] … [¶] … He was part of a stabbing on facility C yard of inmate Villalobos. The other person with him was Mr. Trejo[,] who is also a Sureno gang member. They're acting together. This order would not have been carried out if they weren't Sureno gang members. The assault wouldn't have occurred unless it was sanctioned or authorized by the powers to be that have been mentioned here, and

14.

both of these individuals would not be on that facility were they not active Sureno gang members.  Because had they not been active members[,] again, one, they wouldn't have participated in it.  Two, they would have been removed from that yard themselves, because any Sureno on that yard has to put in work to maintain his bed or his stay on that facility."  As we shall explain, because there was no factual basis for this theory, it lacked foundation and was not a proper basis on which to rely when forming an expert opinion.

### B.  Trejo

Meyer opined Trejo was a member of the Sureno gang.  Meyer reviewed a Santa Ana police report dated January 18, 2000, which stated Trejo had admitted he acted as a lookout for two others who stole a stereo.  The two men Trejo was with were identified as members of the Latin Boys Sureno criminal street gang.  According to Meyer, gang members normally will assist each other in committing crimes.

Meyer next reviewed a document dated May 23, 2000, wherein police officers stated Trejo had admitted he was a Sureno gang member.  An August 30, 2002, Santa Ana police report stated Trejo was a getaway driver for two Latin Boys gang members who shot and killed a rival gang member.  Meyer noted that Trejo admitted he was a member of the Latin Boys Sureno gang in his initial housing report.

Meyer again asserted the prosecution's theory of the altercation, as he understood them, supported his opinion.  "Again, Surenos on that yard carried out that order. Mr. Trejo and Mr. Jimenez, they wouldn't have done it without the proper authorization through their chain of command, so they acted together.  Two gang members acting together to assault another gang member, and again Mr. Trejo is also living on that facility which is an active facility, and you have to earn your keep on that yard."

The photos found on the wall of Trejo's cell also were deemed significant by Meyer.  "I in fact interviewed Officer Harris about this picture that was posted in [Trejo's] cell, and the reason I did that is because it was my belief that that is what he was doing was hanging the picture of himself up there, framing it in a frame glorifying

15.

himself, but the picture of inmate Villalobos was not framed, this is just what I did. It is like graffiti, marking your territory, bragging about who you are, putting your moniker up next to the name of your gang. He is doing the same thing with his pictures, he is announcing loudly to everyone that is what he did and he claims ownership of it." According to Meyer, Trejo would not have put up such a picture unless the altercation was sanctioned by the leadership of the Sureno gang.

### 3. Pinuelas

Meyer opined Pinuelas was a member of the Sureno gang. Meyer began by noting that a probation report indicated Pinuelas had stated he used "to affiliate with Eastside Central, which is a Sureno gang out of the El Centro area, but that he no longer does." Meyer asserted that Eastside Central "is a Sureno street gang, it is documented."

Meyer then testified that to determine if a subset or click was a Sureno gang, he would (1) ask other officers if they had heard of the gang, (2) talk to gang members who were familiar with other Sureno gangs, and (3) use the Internet because it "is a great tool that we use various web sites." Meyer used these tools to conclude that Eastside Central was a Sureno gang.

Meyer reviewed a contact from the Los Angeles Police Department dated August 5, 1998, which indicated Pinuelas had been found in possession of a handgun, marijuana and methamphetamines on that date. These things indicated to Meyer that Pinuelas was a gang member because "Gang members sell drugs, they possess drugs, and they arm themselves with handguns."[10]

Meyer relied on an incident report from Kern State Prison dated July 16, 1999, which stated Pinuelas had "stabbed a black inmate … a number of times with a weapon

---

[10]An objection to the answer was sustained, but there was no motion to strike the answer.

16.

that was approximately seven-and-a-half inches long." Pinuelas also stated, "some people have to do it, I like to do it."

Meyer reviewed a contact from the Salinas Valley State Prison dated October 19, 2001, which stated Pinuelas and another inmate were seen attacking another Sureno inmate. The report stated Pinuelas was seen attacking a Southern Hispanic and Meyer concluded that CDCR "uses a Southern Hispanic designation for a Sureno criminal street gang member" even though Meyer was not familiar with CDCR's regulations for such a designation. Accordingly, Meyer concluded the altercation was between three Surenos "Because Sureno gang members do not attack their own unless there is a reason, and the reason would be for gang-related issues."[11] Meyer admitted "Southern Hispanic inmates or Surenos" will attack other Southern Hispanic inmates "all the time."

Meyer testified that a February 6, 2003, incident log from Corcoran State Prison stated there was a weapon and other metal pieces found inside of Pinuelas's property. This was significant because "Gang members possess weapons in jail for protection." Although an objection was sustained to both attempts by the prosecution to elicit this information, the trial court failed to strike the testimony despite a request to do so.

Meyer reviewed an initial housing review dated May 10, 2005, wherein a "lieutenant with the Department of Corrections documented that Mr. Pinuelas was a Eastside [Central] Sureno gang member, and that his moniker is ['S]ilent.[']" Meyer also reviewed various tattoos found on Pinuelas that supported his conclusion Pinuelas was a Sureno gang member.

### 4. *Opinion Testimony Related to the Altercation*

Meyer also opined that Pinuelas was "the shot caller for our Surenos in the Kings County Jail right now." According to Meyer, "it was brought to [his] attention by the

---

[11]The trial court again sustained an objection to the answer, but no motion to strike was made.

classification sergeant at the Kings County Jail who called [him] and notified [him] that Mr. Pinuelas upon his arrival started --" An objection to this testimony was sustained, but no motion to strike was made.

Meyer then stated that in 2007 Pinuelas was the shot caller or overall authority of the inmate power structure at SATF. Meyer opined that Pinuelas obtained this position because his mother dated the brother-in-law of a member of the Mexican Mafia. He further opined there was a power structure at SATF based on conversations he had had with other gang members, letters written by inmates, and the kites that allegedly authorized the attack on Villalobos.

### 5. *Testimony Regarding the Alleged Conspiracy*

Meyer also testified about whether Jimenez or Trejo was ordered to attack Villalobos. He asserted the tattoos found on Villalobos suggested he had committed crimes of violence for the Surenos. Since neither Jimenez nor Trejo had similar tattoos, when they attacked Villalobos they gained respect within the gang and increased their stature in the Sureno ranks. Meyer further opined that Jimenez and Trejo would not undertake such an attack without approval of someone with more power within the organization.

Meyer also offered his opinion that Pinuelas ordered Trejo and Jimenez to attack Villalobos. "[T]hey would not have attacked inmate Villalobos who had ties to another Mexican Mafia member had they not had the proper authorization, otherwise it would have been their fault for hitting somebody they shouldn't have. So they would … have absolutely made sure that without a doubt they were authorized to carry out this hit." Further, Meyer opined that inmate Guzman ordered Pinuelas to have Villalobos attacked. There is no indication on what Meyer based these comments.

18.

**Closing Argument**

*Prosecution*

The prosecutor began her opening argument by asserting the evidence proved that Pinuelas was the Sureno in charge of the inmates at facility C at SATF, and another group of Surenos was attempting to take over control of the facility. She theorized that the motive was money from the drug sales at the prison. She also posited that Villalobos and two other inmates originally from the same area were the inmates attempting to take over the facility, which was authorized by a different Mexican Mafia member also originally from the same area as Villalobos.

The only evidence to support the theory cited by the prosecution was the kite authorizing the attack, which named Villalobos and the other two inmates. There was no evidence that Villalobos knew this Mexican Mafia member, knew the other two inmates, or had any contact with any of the three other inmates.

The prosecutor argued the authorization kite was sent by Pinuelas to other inmates who then ordered Jimenez and Trejo to attack Villalobos. She began by referring to the extensive testimony of the prison guards about how kites could be moved around the prison.

While admitting there was very little direct evidence to support the charges, the prosecutor argued the circumstantial evidence was "overwhelming." She relied on the effect on all the inmates that occurred after the altercation as an indication the altercation was over something important. "The shot caller made the decision to remove Mr. Villalobos from the yard, and he was willing to do whatever it [took] and to take whatever hit he had to take from bringing in drugs, to enforcing drug debts, to losing communication for as long as it took. That means something."

She also relied on the tenuous relationship between Trejo and Pinuelas, claiming the one reference to Porky in a phone call established the two knew each other. She also

19.

noted the two requested to share a cell while in the security housing unit after the altercation.

The prosecutor asserted the failure to find a weapon was not relevant because of testimony that weapons frequently are not recovered after an assault. She also stated that Villalobos was cut "very seriously, very badly." This statement ignored the absence of medical evidence to determine whether Villalobos's injuries required stitches and the absence of medical testimony that Villalobos's injuries were caused by a weapon.

Turning to the crimes, the prosecutor argued (1) Pinuelas, Jimenez, and Trejo conspired to murder Villalobos (count 1); (2) Pinuelas aided and abetted Jimenez and Trejo when they attempted to murder Villalobos because he authorized the attack (count 2); and (3) Pinuelas aided and abetted Jimenez and Trejo when they assaulted Villalobos with a deadly weapon because he authorized the attack (count 3).

### Defense[12]

Counsel for defendants attacked the prosecution's case from many fronts. They argued the video of the attack established Villalobos was the aggressor, not Trejo and Jimenez. Trejo and Jimenez were simply defending themselves. Counsel also pointed out the absence of evidence that Villalobos suffered any injury caused by a weapon. They asserted the evidence related to the kites was unreliable because it was not handled properly by Couch and his department. They attacked the opinions rendered by Couch and Meyer as unsupported by any relevant facts and were actually nothing but conjecture. They asserted the evidence failed to prove any connection between Pinuelas and the authorization kite on the one hand and Trejo and Jimenez on the other hand.

---

[12]Each defense attorney argued the case slightly differently. To ease the reader's task, we summarize the arguments made without attempting to identify which attorney made the argument.

20.

*Rebuttal*

In rebuttal, the prosecutor asserted, in essence, that the only possible conclusion that could be drawn from the facts was that drawn by the prosecution's experts.

**Verdict and Sentencing**

The jury found defendants guilty of each charged crime and found each enhancement to be true.  Each defendant was sentenced to a term of 25 years to life on count 1, plus a determinate term of 10 years for the section 186.22 enhancement.  The life sentence was doubled pursuant to section 667, subdivision (e)(1), for a total indeterminate term of 50 years to life.

## DISCUSSION

This is a case in which a jury accepted opinion as fact.  While in many respects expert testimony was necessary, much of the expert testimony was based on nothing more than speculation and conjecture.  Consequently, defendants are correct that the evidence to support the convictions was insufficient.

## Sufficiency of the Evidence

*Standard of Review*

Our review of the sufficiency of the evidence is deferential.  We "'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496; *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681.)  We focus on the whole record, not isolated bits of evidence.  (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203.)  We presume the existence of every fact the trier of fact reasonably could deduce from the evidence that supports the judgment.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  We will not substitute our evaluations of a witness's credibility for that of the trier of fact.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)

21.

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

Circumstantial evidence does not directly prove a fact, but, if the circumstantial evidence is believed, the jury may infer the truth of the fact in question. (CALCRIM No. 223.) But a reasonable inference may not be based on conjecture or guesswork. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416-1417.) Black's Law Dictionary defines an inference as "A conclusion reached by considering other facts and deducing a *logical consequence* from them." (Black's Law Dict. (9th ed. 2009) p. 847, col. 2, italics added.) "The strength of an inference may vary widely. In some circumstances, the preliminary facts may virtually compel the conclusion. In other circumstances, the preliminary facts may minimally support the conclusion. But to constitute an inference, the conclusion must to some degree reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference. [Citations.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) In other words, factual findings must be based on inferences drawn from evidence, not speculation as to probabilities without evidence. (*Sifuentes,* at pp. 1416-1417.)

Furthermore, substantial evidence is not the same as any evidence, or a mere scintilla of evidence. (*In re Alenander L.* (2007) 149 Cal.App.4th 605, 614 (*Alexander L.*).) To be substantial, the evidence must be reasonable, credible, and of such solid value that a reasonable trier of fact could find the defendants guilty beyond a reasonable doubt. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

*Analysis*

A significant part of defendants' arguments is that the trial court admitted improper opinion testimony. In our view, the admission of expert testimony was in many respects erroneous. Primarily, the testimony of Couch and Meyer, the only evidence offered to support the prosecution's theory, was nothing more than speculation and conjecture. Expert testimony that rests on assumptions, conjecture, and speculation "has little or no probative value, bears the potential to mislead the jury into accepting the unsupported assumption and drawing from it unwarranted conclusions, and thus cannot significantly 'help the trier of fact evaluate the issues it must decide.' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 406 (*Moore*).) "That an event *could* have happened, however, does not by itself support a deduction or inference it did happen.… Jurors should not be invited to build narrative theories of a … crime on speculation." (*Ibid*.)

A review of the evidence supports our view.

It is undisputed there was an altercation involving at least Trejo, Jimenez, and Villalobos. Correctional officers observed the three fighting, and the three were identified at the conclusion of the altercation. What is unclear is whether these three were the only inmates involved in the altercation.

The video of the altercation entered into evidence by the prosecution proves this point. This footage is not a video similar to a movie, but instead appears to be still photographs taken every two seconds and then presented in the form of a video. We have

reviewed this video extensively, and, contrary to the prosecution's testimony, it is clear that at least two different altercations occurred.

In the first altercation, first three and then only two inmates fought with each other. The prosecution asserted there were three inmates throughout this part of the altercation, but that is incorrect. The video conclusively shows one inmate leaving the fight and two inmates continuing to fight each other for the majority of this altercation. These two inmates then appear to stop fighting and leave the screen. This altercation lasted 35 seconds according to the timer on the video.

Shortly after the first altercation ended, a second altercation began. Trejo, Jimenez, and Villalobos can be identified as the participants in this altercation because at the end of the video the three follow the commands of the correctional officers and lay on the ground, where they were apprehended and identified. It is impossible from this video, however, to determine who instigated the fight. This altercation lasted 32 seconds according to the timer on the video.

It is impossible to tell from this video if the two combatants in the first altercation also were involved in the second altercation. There was no eyewitness testimony to establish the identity of the two combatants in the first altercation. Therefore, to assert that Trejo, Jimenez, and Villalobos were involved in the first altercation is just speculation.

The next issue unsupported by evidence is the claim that Jimenez and Trejo caused the injuries suffered by Villalobos. While it is clear that Villalobos suffered injuries that day, it is impossible to know if he suffered the injuries in the first altercation or the second altercation, or both. Accordingly, it is impossible to attribute Villalobos's injuries to Trejo and Jimenez. It is possible Villalobos was involved in the first altercation with an unknown inmate and was injured in that altercation. To attribute all the injuries suffered by Villalobos to his altercation with Jimenez and Trejo is, once again, speculation.

24.

Another problematic issue is the lack of medical evidence about Villalobos's injuries. He was seen initially at the prison infirmary, where he was evaluated by registered nurse Powell. Her testimony about Villalobos's injuries was minimal. She observed the injuries, cleaned them, and determined a doctor's opinion was needed about some of the injuries because she believed they might need stitches. Villalobos was then transported to another facility for treatment. Correctional Officer Anders testified that Villalobos's cuts and abrasions had stopped bleeding when she photographed the injuries before he was transported. There was no medical testimony from anyone, including registered nurse Powell, that any injury suffered by Villalobos appeared to have been caused by some type of weapon.

While the photographs Anders took were entered into evidence and displayed to the jury, the prosecution did not present testimony from the doctor who eventually treated Villalobos, did not present testimony from Villalobos, and did not introduce medical records for the injuries. In other words, from the evidence presented, it was impossible to know the cause or extent of the injuries suffered by Villalobos. The prosecution argued the pictures established Villalobos suffered great bodily injury without any medical evidence about the type of treatment required to care for the injuries. Indeed, from the evidence admitted it is impossible to know what, if any, additional treatment Villalobos may have received or if Villalobos required any stitches to treat his injuries.

The prosecution's failure to present medical testimony also undermines the assertion that Trejo and Jimenez used a weapon in the altercation with Villalobos. Once again, we point out there were two altercations, and Villalobos may or may not have been involved in both. Therefore, if there were competent evidence Villalobos suffered injuries caused by some type of stabbing implement, it is pure speculation to assert that Trejo and Jimenez inflicted those injuries.

Also, there was no evidence, outside of the testimony of Couch and Meyer, that a weapon was used in either altercation. The correctional officers who observed the

25.

altercation did not observe a weapon, nor did they observe any type of stabbing motion by either Trejo or Jimenez. No weapon was found when a search of the area was conducted by correctional officers. In other words, there was no physical evidence to suggest a weapon was used in the altercation.

The only piece of arguably relevant evidence to support the prosecution's case was the kite. But, this evidence also is problematic. Substantial evidence supports the conclusion the kite was written by Pinuelas and was intended to convey to someone that Villalobos was to be disciplined. Yet, it was not found until 13 days after the altercation, and it was found in a different building than the building in which Trejo and Jimenez were housed. There was no evidence (1) the kite was written before the altercation, (2) the kite was seen by anyone other than Pinuelas and Valencia, the inmate in whose possession the kite was found, or (3) that Trejo and Jimenez had any knowledge of the kite.

To fill this void, the prosecution relied on Couch and Meyer. These witnesses both theorized that because of the discipline required in the Sureno prison gang, Jimenez and Trejo would not have attacked Villalobos unless they had received an order to do so. This theory is based on the assumption that Jimenez and Trejo attacked Villalobos. As explained before, there was no evidence, including the video, to support this assumption.

On the other hand, if we assume Villalobos attacked Jimenez and Trejo, then the "order," or kite, has no evidentiary value. Moreover, if we assume Villalobos attacked Jimenez and Trejo, then logic compels the conclusion the kite was written after the altercation because Villalobos violated the rule prohibiting fighting among Surenos.

We recognize there is no evidence to support these assumptions, just as there was no evidence to support the assumptions of Couch and Meyer. The point is that different assumptions lead to different conclusions. That is why evidence must support assumptions.

26.

To attempt to convince the jury that Pinuelas ordered the attack on Villalobos, the prosecution argued an elaborate theory. In this theory, Pinuelas was in charge of Sureno activities at SATF because of his relationship to Guzman, a member of the Mexican Mafia. Villalobos was attempting to take control of SATF from Pinuelas and was acting with the permission of a different member of the Mexican Mafia. According to this theory, Pinuelas ordered the attack on Villalobos because of the attempted mutiny.

The problem with this theory is the timing. The prosecution relied on phone calls between various individuals outside of SATF, including Pinuelas's mother, and various inmates, including Pinuelas, in an attempt to establish Villalobos's mutiny. These phone calls occurred on August 8 and October 3, 19, 20, and 21, 2006. Couch and Meyer both testified that attempting to establish a competing power structure would result in immediate action by Pinuelas. However, the attack did not occur until April 3, 2007, more than five months after the last phone call. The prosecution did not explain this gap.

We have demonstrated that no part of the prosecution's theory was supported by the evidence. Indeed, the evidence contradicted most parts of the theory. This is not to say the prosecution's theory was incorrect. However, a theory lacking evidentiary support cannot support a judgment. Simply because these events could have happened does not support a deduction or inference that they did happen. (*Moore, supra*, 51 Cal.4th at p. 406.) In other words, it was improper for the jury to deduce or infer that Trejo and Jimenez attempted to murder Villalobos simply because it could have happened. The prosecution was required, and failed, to support its theory with substantial evidence.

**Limitations of Expert Testimony**

Not only was the prosecution's reliance on Couch and Meyer misplaced, much of their testimony violated basic limitations on expert witness testimony. Resolution of this case does not require a complete dissection of the flaws in their testimony, but we think it will be helpful to point out some mistakes.

27.

Well-established law in California permits an expert to offer an opinion only if (1) the opinion is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and (2) the opinion is "[b]ased on matter (including his special knowledge, skill, experience, training and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates .…" (Evid. Code, § 801.) Such testimony is permitted because the law favors the admission of evidence that makes comprehensible and logical that which is otherwise inexplicable and incredible. (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.)

Not only is a witness testifying as an expert limited to testifying to subjects beyond common experience, the law places other limits on expert testimony. Experts may not testify to legal conclusions. (*People v. Jones* (2013) 57 Cal.4th 899, 950.) Nor may he or she base an opinion on surmise, guesses, or conjecture. (*Id.* at p. 951; *People v. Vang* (2011) 52 Cal.4th 1038, 1046 (*Vang*).) Expert testimony based on surmise or conjecture is without foundation and is not substantial evidence. (*Alexander L., supra,* 149 Cal.App.4th. at pp. 612-613.) Similarly, expert testimony which is conclusionary is not substantial evidence. (*Ibid.*)

An expert cannot express an opinion as to a defendant's guilt or innocence because such opinions do not aid the trier of fact, i.e., the trier of fact is as competent as the witness to weigh the evidence and draw conclusions on the issue of guilt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 (*Coffman and Marlow*).) Such opinions are both unhelpful to the jury and too helpful. (*People v. Prince* (2007) 40 Cal.4th 1179, 1227.) The jury is equally equipped to determine guilt, and an expert opinion may give the jury the impression the issue has been decided and need not be the subject of deliberation. (*Ibid.*)

Similarly, an expert may not opine on whether or not a witness is telling the truth. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 82.) Credibility determinations are the jury's province, and the jury does not need the assistance of an expert. (*Ibid.*) Moreover, it is impermissible for an expert to testify that a specific person had a specific intent. (*Vang, supra,* 52 Cal.4th at p. 1048.)

These limitations repeatedly were exceeded by Couch and Meyer. Both officers testified Pinuelas ordered the assault, Trejo and Jimenez attacked Villalobos, and a weapon was used during assault. As we have explained, there was no evidence to support these assertions, i.e., Couch and Meyer were speculating about how and why the altercation occurred. Instead, these assertions, clothed as the "opinions" of Couch and Meyer, were attempts by the prosecution to establish the elements of the offenses where no evidence existed. These statements were Couch and Meyer's opinions about the guilt of defendants and did not aid the jury because the jury was as competent as the witnesses to determine the guilt of defendants based on admissible evidence.

Not all of these statements resulted in an objection. The point is, however, that this testimony was not substantial evidence of the elements of the crimes because they were all based on conjecture and speculation.

Finally, we note this was a lengthy trial, much of it consumed by the testimony of Couch and Meyer. The Supreme Court recently has reiterated the trial court has an obligation to act as a "gatekeeper" when the parties seek to introduce expert testimony.

> "Thus, under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion. As we recently explained, '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors …. [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" [Citation.]' [Citations.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)

29.

Much of the testimony offered by Couch and Meyer did not assist the trier of fact. Indeed, much of it was duplicative and unnecessarily time consuming, especially the evidence presented to establish that defendants were gang members. California courts have long recognized the prejudicial effect of gang testimony. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) Such evidence should not be admitted if the only relevance is to establish the bad character of the defendants. (*Ibid*.) The trial court must carefully scrutinize gang-related evidence before its admission because of its potentially inflammatory impact, even where such evidence is relevant. (*Ibid*.)

While the gang evidence was relevant here, the extensive evidence presented for facts that were not contested strongly suggests the prosecution was attempting to influence the jury through this inflammatory evidence. In this case, we find apt the following quote from *People v. Williams* (2009) 170 Cal.App.4th 587, 610-611: "We strongly disagree with the view that prosecutors have any right to 'over-prove their case or put on all the evidence that they have.' In our view, the trial court and the prosecutor must also be mindful of the burden on the court system and on the jurors who are required to disrupt their lives for the duration of the trial. In other contexts, courts have recognized the trial court's duty to consider the burden on jurors and the court itself in, for example, determining whether to grant a continuance. [Citation.] In short, the state has a strong interest in prompt and efficient trials, and that interest permits the nonarbitrary exclusion of evidence, including 'when the presentation of the evidence will "necessitate undue consumption of time."' [Citation.] Accordingly, neither the prosecution nor the defendant has a right to present cumulative evidence that creates a substantial danger of undue prejudice [citation] or that unduly consumes the court's time [citation]. In [*People v.*] *Ewoldt* [(1994) 7 Cal.4th 380], the Supreme Court emphasized that cumulative evidence of uncharged offenses may be inadmissible under Evidence Code section 352. The court explained, 'In many cases the prejudicial effect of such evidence would outweigh its probative value, because the evidence would be merely

cumulative regarding an issue that was not reasonably subject to dispute.' [Citation.]" While we need not decide if these principles were violated here, it appears the prosecution's excessive evidence may well have done so.

## DISPOSITION

The judgment is reversed.


_____
CORNELL, J.


WE CONCUR:


_____
LEVY, Acting P.J.


_____
PEÑA, J.